McCarthy *v.* Ference (et al., Appellants).

486

Argued January 7, 1948; reargued January 16, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused April 12, 1948.

*William A. Challener, Jr.*, with him *Harold F. Reed* and *Challener & Challener*, for appellants.

*Thompson Bradshaw*, with him *Marvin D. Power* and *Margiotti & Casey*, for appellee.

*J. Roy Dickie*, with him *Dickie, Robinson & Mc-Camey*, for Stanley Ference et al., trading as Ohio River Motor Coach Company.

OPINION BY MR. JUSTICE HORACE STERN, March 22, 1948:

This proceeding is the outcome of a dreadful tragedy.[1] In the gathering dusk of the late afternoon of December 22, 1942, a motor bus operated by Ohio River Motor Coach Company was proceeding towards Pittsburgh, at a speed of some 25 or 30 miles an hour, on a street in the Borough of Aliquippa called Constitution Boulevard, otherwise designated as State Highway Route 930. At a point about a quarter of a mile north of the bridge which crosses the Ohio River between Aliquippa and Ambridge a huge rock, of a weight estimated at eight tons, fell from a hillside adjoining the highway, struck the side of this bus with tremendous force, pushed it across to the outer edge of the road, and left it partly hanging over the embankment above the tracks of the Pittsburgh & Lake Erie Railroad which there parallel the highway. The fall was from a point on the cliff about 25 to 40 feet above the level of the highway and was followed by a larger slide of other rocks, boulders, mud and debris, amounting in all to approximately 3000 cubic feet in volume and 240 tons in weight. Of the persons in

---

[1] A large number of similar actions are pending.

the bus 20 were killed and 3 seriously injured. One of the latter, a passenger, was John A. McCarthy, the present plaintiff, who is now seeking to recover damages for his injuries from the Coach Company, the Woodlawn Land Company and the Jones & Laughlin Steel Corporation. As the result of a trial by jury he recovered a verdict against the two latter defendants in the amount of $35,000, subsequently reduced by the court to $25,000; motions for a new trial and for judgments n.o.v. were overruled. The jury found in favor of the Coach Company and it may be stated at the outset that this was eminently proper because there was no evidence of any negligence on the part of the operator of the bus, who was himself killed in the accident; the rock started to fall at a time when the bus was only some 30 to 40 feet distant and when it was running so near the base of the hill that it would have been quite impossible for the operator to have seen, much less avoided, the impending danger.

The action was brought against the Land Company because it held title to the portion of the hillside from which the rock fell and against the Steel Corporation because it not only owned all the stock of the Land Company but allegedly was in complete control of it and had created it as a mere departmental unit of its own operations. The present appeals to this Court are by these two corporate bodies.

The Steel Corporation owns a tract of land, on which its plant is located, on a flat bordering the Ohio River in Hopewell Township, Beaver County. Meandering through the plant site and roughly paralleling the river was originally an unimproved country road, known as the Phillipsburg and Saw Mill Run Road, which ran from the former village of Phillipsburg, now the Borough of Monaca, to the Borough of South Heights at or near the Allegheny County line. Further to the west, skirting the base of the hillside, is the four-track system of the Pittsburgh and Lake Erie Railroad. The hill

itself extends, with some breaks, for a distance of several miles in a generally northerly and southerly direction; at the place where the accident occurred its height is about 200 feet.

There were grade crossings of the railroad over two small roads or pathways which connected with the Phillipsburg Road, and it was the desire of the Railroad Company to eliminate those crossings. It was similarly the desire of the Steel Corporation to rid itself of the interference of the Phillipsburg Road running through the heart of its plant site and, incidentally, to capture the land occupied by it, amounting to 240,000 square feet, for its own industrial uses. Accordingly, in 1909, the two corporations entered into an agreement which provided that, as soon as it proved advisable, they would, at their joint expense, endeavor to change the location of this road to the hillside on the west of the railroad tracks. In 1925 they entered into an agreement with Beaver County, wherein these intentions took definite shape; they agreed to build a new highway from a point west of the Aliquippa-Ambridge Bridge, the construction of which was then in contemplation, northwardly to Station Street in the Borough of Aliquippa, a distance of some 8000 feet, to dedicate this highway to public use, and to take action to have the old road vacated; the County, on its part, agreed to pave 18 feet of the new highway with concrete. In 1926 the Steel Corporation and the Railroad Company entered into another agreement which provided that the Railroad Company would give out the contracts in its own name for building the highway and for paving 6 feet of its width so as to make a total paved width of 24 feet; the Steel Corporation agreed that it would, with the co-operation of the Railroad Company, conduct the necessary legal proceedings for vacating the old Phillipsburg Road and for obtaining permission of the Public Service Commission to remove the grade crossings; the Steel Corporation and the Railroad Company were to bear the cost of

the operation in equal shares and all contracts were to be approved by the respective engineers of both companies. All these plans were carried out at an eventual cost to each of the corporations of about one-quarter of a million dollars, and the appropriate legal actions were taken by all the authorities concerned; the old road was vacated and the approval of the Public Service Commission was obtained in response to a petition filed by the Railroad Company. In May, 1928, the highway having meanwhile been constructed and opened for public travel, the Steel Corporation tendered to the Borough a dedication (dated June 21, 1926) by Woodlawn Land Company and other abutting property owners of a 50 foot right-of-way, together with a bill of sale of all the Steel Corporation's right, title and interest in the highway as constructed, it not then having title in its own name to any of the land out of which the highway was built; at the same time the Railroad Company, which did own a substantial portion of that land, dedicated all its right, title and interest in the 50 foot strip. The Borough, by ordinance of May 21, 1928, accepted the dedication of the highway for public use as one of the streets of the Borough; by an ordinance of the same date it vacated the old road and relocated it so as to be within the lines of the new highway,—an action approved, on petition, by the Court of Quarter Sessions of the County. On January 1, 1936 the Secretary of Highways, in pursuance of the Act of July 12, 1935, P. L. 746, adopted Constitution Boulevard as a state highway, and thereafter the State Highway Department assumed its maintenance, at least from curb to curb, the Borough continuing to maintain the sidewalks and the gutter.

The new road was constructed at a point about 15 feet up the slope by cutting a shelf or ledge into and along the hillside of a width or depth of about 35 feet; the excavation above it rose perpendicularly to a height of about 50 feet, above which the hillside remained in its virgin state. The Borough built an elevated sidewalk

of a width of 6 feet along the westerly side of the road; the westerly line of the 50 foot right-of-way is approximately 15 feet west of the west edge of that sidewalk; beyond this 15 feet the title to the land upon the hillside remained in the Woodlawn Land Company.

Originally the hill, in its natural state, was covered with vegetation and the railroad trackage at its foot was not subject to any large slides or rock-falls, but there was testimony at the trial on behalf of the plaintiff that after the cut was made cracks and crevices appeared all over the hillside which would have been observable to one making an inspection. There was also expert testimony to the effect that rain, snow and surface water were bound to seep into the fissures of the rock, that when the temperature would drop from 36 to 32 degrees the water, in freezing, would expand one-seventh or one-eighth of its volume and that the pressure so created would cause the crevices to widen so that portions of the rock, becoming overbalanced and no longer receiving support from the slope of the hill, would topple down the cut and onto the road below—in short, that because of weathering and resulting processes of disintegration of the rock and the underlying strata, and in view of the fact that the condition of repose had been disturbed, an accident such as that which finally occurred was constantly imminent. Warnings were numerous. A multitude of witnesses testified that from 1928 when the road was opened until 1942 when the accident happened there were numerous land slides and falls of rock upon the highway, some comparatively slight in volume but others of sufficient magnitude to require the temporary closing of the road to traffic in whole or in part, and, while the witnesses could not always identify the exact months or even years when the particular falls occurred, they did state that they usually took place in the springtime following freezing and thaws and from one end of the highway to the other; indeed they were so regular in their recurrence that the street obtained a notorious reputation as a dan-

gerous highway. This condition became marked to such a degree that in 1936 the walk which had been constructed on the west side of the road was barricaded to travel at both ends and the Borough constructed a new 4 foot walk on the east side; at the same time numerous danger signs were posted reading "Falling rock. Travel at your own risk". Moreover a public petition was presented to the State Highway Department urging that the boulevard be made safe for public travel, in response to which the Department arranged for workers of the Public Works Administration to go up the hillside for the purpose of removing weathered and loose stone and earth, if necessary cutting away a portion of the hill, and taking other measures to obviate the threatened danger. The Department procured the appropriate equipment and apparatus and then attempted to get from the abutting landowners permission to enter upon their lands and releases of liability for any damage resulting from the proposed operations, but the Land Company, or the Steel Corporation, or both of them, (the evidence is not entirely clear), withheld their consent, so that the State Highway Department and the Public Works Administration, frustrated in their efforts, had to abandon the project.

For some time prior to the deplorable accident which finally happened there had been recurring rainstorms, freezing and thaws, and on the very day of the catastrophe the weather was rainy and sleety. The street was heavy with traffic when the rock fell.

Under the circumstances thus set forth are the Woodlawn Land Company and the Jones & Laughlin Steel Corporation liable to the victims of the accident? That is the question presented by this litigation. Plaintiff does not assert a right to recover based on any alleged negligence or impropriety in the original location or construction of the boulevard; had there been any such negligence or error of judgment it would have been cured, as far as these two corporations are concerned, by the approval of

the Public Service Commission and the acceptance of the dedication by the Borough of Aliquippa; so much was held in *Smith v. Pennsylvania R. R. Co.*, 201 Pa. 131, 50 A. 829, and *Slivka, Administratrix, v. Ference*, 353 Pa. 339, 344, 45 A. 2d 40, 42. But what plaintiff does claim is that, since the construction of the road changed the natural slope of the hillside which had theretofore been stable and in repose, there was thereby created a duty on the part of the Land Company and the Steel Corporation, which, in dedicating the 50 foot roadway, had retained ownership, possession, dominion and control over the slope, of subsequent watchful inspection and proper maintenance of their land abutting on the highway, and that, by their negligence in failing to conduct such inspections and to undertake the measures the necessity of which such inspections would undoubtedly have disclosed, they became liable for the injuries caused by the accident which resulted.

It may be true, generally speaking, that a landowner is not subject to liability for bodily harm caused to others outside the land by a *natural* condition of the land, even though he recognizes or should recognize the natural condition involved a risk of such harm; (see Restatement, Torts, §363). Here, however, we are concerned with a happening that was caused, not by a natural, but by an *artificial* condition created by human agency, and which became harmful through the subsequent operation of natural forces.

In Restatement, Torts, §364, it is said that "A possessor of land is subject to liability for bodily harm caused to others outside the land by a structure or other artificial condition thereon, which the possessor realizes or should realize as involving an unreasonable risk of such harm, if (a) the possessor has created the condition, or (b) the condition is created by a third person with the possessor's consent or acquiescence while the land is in his possession, . . ." Section 365 states that

"A possessor of land is subject to liability for bodily harm caused to others outside the land by the disrepair of a structure or other artificial condition thereon, if the exercise of reasonable care by the possessor . . . (a) would have disclosed the disrepair and the unreasonable risk involved therein, and (b) would have made it reasonably safe by repair or otherwise." In Comment "a" to this section it is said that "The word 'disrepair' indicates that the condition of the structure has deteriorated since its creation. It includes dilapidations caused by the usual force of nature . . ."

There are numerous cases in our own Commonwealth applying the principles thus stated and in which liability was imposed upon a possessor of land who had not exercised the reasonable care required under such circumstances; for example, where, by reason of neglect to keep its canal in repair, a canal company allowed water therefrom to overflow adjoining land (*Saylor v. Smith*, 2 W.N.C. 687) ; or where the owner of premises allowed a concentration of rainwater on his roof to flow against the wall of the neighboring property (*Gould v. McKenna*, 86 Pa. 297) ; or where the owner of a lot on the slope of a hill allowed dirt to fall therefrom upon land situated further down the slope (*McKnight v. Denny*, 198 Pa. 323, 47 A. 970) ; or where the owner of a wall, left standing in a weakened condition after a fire, failed to repair it, with the result that it was blown down by the wind and fell upon a person on the adjoining land (*Fitzpatrick v. Penfield*, 267 Pa. 564, 573, 109 A. 653, 656) ; or where a person was killed in passing along a private way by the fall on the abutting land of an insecure wall negligently left standing too near the path (*Fortunato v. Shenango Limestone Co.*, 278 Pa. 499, 123 A. 482) ; or where lower property owners on a steep slope were damaged by the action of defendants in making a fill on their lands further up the slope, which caused a slide and consequent injury to plaintiffs' lands

and buildings (*Gordon v. Pettey*, 291 Pa. 258, 139 A. 914) ; or where an owner allowed a loose piece of concrete to fall from a wall and injure a person working on the adjoining land, it being held that the defendant was obliged to consider the fact that stone may deteriorate and become a menace to human safety, and therefore was under the obligation to have the wall inspected at intervals (*Pope v. Reading Co.*, 304 Pa. 326, 156 A. 106) ;[2] or where, by reason of filling operations, earth and stone were allowed to slip down from the face of a steep hill to plaintiff's property at the base thereof (*Pennsylvania R. R. Co. v. Pittsburgh*, 335 Pa. 449, 6 A. 2d 907) ; or where dirt, stones and other debris from excavations on defendant's land fell or were washed down upon plaintiff's lower-lying land (*Wally v. Baldwin*, 94 Pa. Superior Ct. 199). Nor are such illustrations of the principles here involved confined to situations where damage resulted to adjoining land privately owned or injury to persons thereon, but they extend also to cases of injury to persons on public highways; for example, where a child on the sidewalk was injured by the fall of a door in proximity to the street (*Drinkwater v. Quaker City Cooperage Co.*, 208 Pa. 649, 57 A. 1107) ; or where a person was injured on the sidewalk by the fall of an ornamental bracket from the front of an abutting building (*Joyce v. Black*, 226 Pa. 408, 75 A. 602) ; or where a person on the street was struck by a piece of tin and wood blown by a storm from a sign located a few feet from the highway (*Sorensen v. Quaker City*

----

[2] Incidentally, it was said in that case (p. 331, A. p. 108) : "On account of the fact that ordinarily more people pass on the sidewalk in front of one's property than are ever likely to pass over or congregate on a lot alongside of one's property, the person in possession of property is held to a higher degree of care in respect to the safeguarding of a wall or other structure in front of that property and near a street or footway than he is to his wall or structure not adjoining a public highway or footway.

*Poster Advertising Co.,* 284 Pa. 209, 130 A. 432) ; or where a pedestrian on the sidewalk was injured by the fall of a heavy theatre sign (*Sakach v. Antonoplos,* 298 Pa. 130, 148 A. 58) ; or where a person standing on the sidewalk in front of a store was struck by a strip of glass falling from the building (*Doerr v. Rand's,* 340 Pa. 183, 186, 16 A. 2d 377, 378) ; or where a person passing on the street was injured when a fence which had been erected on the ground of the abutting owner and allowed to become dilapidated and in disrepair was blown on him by a high wind (*Henry v. Wanamaker,* 45 Pa. Superior Ct. 346). Perhaps the case closest here on its facts is *Shaknis v. State,* 295 N.Y.S. 663 (aff. 277 N.Y. 558, 13 N.E. 2d 472). There the state, *which owned a mountainside adjacent to a highway,* was held liable for injury and death caused by rock from the mountain falling upon persons traveling on the highway. It was shown that during the thawing period each spring rock had fallen on the road; therefore the State was charged with notice of the dangerous condition and, *as the abutting owner* (as well as because of its governmental obligation to maintain the highway in a reasonably safe condition for travel), had the duty of constructing necessary barriers to prevent such an accident.

In the present case the accident which occurred could and should have been anticipated. The Steel Corporation had joined with the Pittsburgh and Lake Erie Railroad Company in the project of cutting the hillside, thereby disturbing its stability and repose. Any reasonable periodic or even occasional inspections would have revealed the resulting probability of danger, to say nothing of the warnings given by the falls themselves which occurred with comparative frequency from 1928 on. Defendants complain of the admission of the testimony relating to these previous falls because they were not in the immediate area of the present accident and not from land owned by the Woodlawn Land Company, nor

was it expressly shown that they resulted from identical conditions. However, they were all from the one stretch of hillside paralleling the boulevard and were quite obviously due to the same natural causes, so that such evidence was clearly admissible: *Ringelheim v. Fidelity Trust Company of Pittsburgh,* 330 Pa. 69, 198 A. 628. Because of what they portended it became the legal duty of the abutting owners, as set forth in the Restatement above quoted and established by the decisions of our courts to the same effect, to take reasonable precautions to forestall such an accident as happened.

Defendants' denial of liability rests for its support principally upon the fact of the dedication of the highway to the Borough of Aliquippa and the subsequent taking over of the road as a State highway, it being argued that thereafter it was the obligation of the Commonwealth, and of it alone, to guard the safety of travelers thereon. It is true that the State Highway Commissioner, with the consent of the local authorities, was empowered, under the Act of May 31, 1911, P. L. 468, sec. 10, to improve or reconstruct a road within the limits of a borough after it had become a part of a State highway, and that the State Highway Department was thereupon charged with the duty of maintaining the road thus improved or reconstructed;[3] that by the Administrative Code of 1929, P. L. 177, sec. 2002, the Department of Highways was given the power to rebuild, relocate, fix the width of, repair and maintain all State highways and was vested with exclusive authority and jurisdiction thereover; and that by the Act of June 23, 1931, P. L. 920, sec. 1, the Secretary of Highways, with

---

[3] Under the Act of May 18, 1923, P. L. 252, the consent of the local authorities to such improvement or reconstruction was no longer required, but such improvement or reconstruction was to rest, together with the maintenance of the road, in the discretion of the State Highway Commissioner, or, as subsequently provided by the Act of May 16, 1929, P. L. 1775, in that of the Department of Highways.

the approval of the Governor and county commissioners, was authorized, upon any part of a State highway within a borough appearing to be dangerous to the traveling public either by reason of width, grades, dangerous turns or other local conditions, to change or establish the width, grades or lines of any such State highway in the borough either before or after the construction, reconstruction or improvement of the same.[4] But all such statutes and the powers and duties conferred thereby upon the Commonwealth have nothing whatever to do with the obligations and liabilities of abutting property owners, and even though the Commonwealth could no doubt have relocated, reconstructed, or closed the highway here entirely, or could have invoked the authority of a court to compel the abutting owners to take steps necessary to avert injury to the traveling public, or might even perhaps have had its proper officials enter the adjacent lands for that purpose, these defendants cannot find refuge in the failure of the Commonwealth to resort to any such measures. The duty of a municipality or of the Commonwealth itself to provide for the safety of the travelers on a public road is something wholly distinct from the duty of the adjacent landowners not to impair such safety by negligence in the maintenance of their own lands beyond the highway limits where such lands had been artificially changed from their natural state. The liability of the Commonwealth or municipality and the liability of the abutting owners under such circumstances are not mutually exclusive but dual and co-existent.

The nominal titleholder to the land from which the rock fell in the present instance was the Woodlawn Land Company, but the testimony clearly indicated that that Company was a mere agency or instrumentality

---

[4] There is a similar provision in regard to *all* State highways in June 26, 1931, P. L. 1388, sec. 1, and July 12, 1935, P. L. 946, sec. 1. the Act of May 31, 1911, P. L. 468, sec. 8, as amended by the Acts of

of the Jones & Laughlin Steel Corporation, which had originally organized it and supplied its capital, owned all its stock, staffed it largely from its own officers and board of directors, and conveyed to it a large part of its land holdings for the purpose of developing a townsite and providing houses for the Steel Corporation's employees. It appears that at all times the Steel Corporation treated the Land Company as nothing more than a department of its own business; indeed it showed its complete disregard of any autonomy on the part of the Land Company by ignoring it entirely in the contracts which it entered into with the Railroad Company and the County; the Land Company had nothing whatever to do with the entire project, nor did it enter as an independent body into any of the negotiations or plans connected therewith. It is true that the mere fact that one corporation owns all the stock of another or that the two companies have common officers or directors does not impose liability upon the parent for the torts of the subsidiary corporation unless the organization and operation of the subsidiary are such that it is only a passive tool in the hands of the dominant corporation; where the latter condition exists the parent company is liable for the torts of the corporation thus controlled: *James McNeil & Brother Company v. The Crucible Steel Company of America,* 207 Pa. 493, 496, 497, 56 A. 1067, 1068, 1069; *Fleming v. Philadelphia Company,* 234 Pa. 74, 80, 81, 82 A. 1095, 1097, 1098; *Chicago, Milwaukee & St. Paul Rwy. Co. v. Minneapolis Civic & Commerce Association,* 247 U. S. 490, 500, 501. Piercing the corporate veil of the Land Company it is clear that that corporation cannot serve as a shield against the liability of the Steel Corporation in this case, and the jury, to which the question was submitted by the learned trial judge, properly so found.

In *Hair, Administratrix, v. Ference,* 352 Pa. 164, 42 A. 2d 535, which was one of the suits arising out of

the accident, the Pittsburgh & Lake Erie Railroad Company was joined as one of the original defendants, and it was held by this Court, affirming the judgment of the court below, that the statement of claim did not present a cause of action against the Railroad Company, which had merely been a party to the contracts for the relocation of the old road and the construction of the new boulevard. In *Slivka, Administratrix, v. Ference,* 353 Pa. 339, 45 A. 2d 40, a similar suit, in which, however, the Railroad Company was joined as an additional instead of an original defendant, it was likewise held that it was not legally responsible for the accident because the liability sought to be fastened upon it was only for alleged negligence in the location, laying out and construction of the highway, and, as already stated, such negligence, if any, was not actionable, the Public Service Commission having approved the project and the municipality having accepted the dedication. In pursuance of the decision in the *Slivka* case the Railroad Company's affidavits of defense raising questions of law to the original defendants' complaints in the present case were sustained and judgment entered for the Railroad Company. Appellants now argue that that judgment operated as a conclusive adjudication that they also are not subject to any liability, but they overlook the fact, which was emphasized in both the *Hair* case and the *Slivka* case, that the Railroad Company had no ownership of the property adjacent to the highway nor any control or duty to maintain or assist in maintaining either the highway or the slopes, nor did it have any right whatsoever to go upon the land on which the hillside was located for any purpose. It must once more be pointed out that the liability presently asserted by plaintiff is based upon negligence, not in the original location and construction of the highway, but in the failure of appellants as abutting landowners to perform their duty of properly inspecting and maintaining their

property in such condition as not to be likely to cause danger to those traveling on the highway. In the *Hair* case it was expressly stated (p. 166, A. p. 536) that "the question of the liability of the Jones & Laughlin Steel Corporation and the Woodlawn Land Company is not here involved."

It is alleged that error was made in the trial of the cause by the admission into evidence of mortality tables; if so, it is unimportant because plaintiff did not undertake to prove any loss of earning power and therefore his probable longevity could not have affected the amount of the verdict. However, we are of opinion that the verdict, even as reduced by the court below, is excessive. Unquestionably plaintiff suffered a severe injury. At the time of the accident he was 26 years of age and was employed by the Steel Corporation in a clerical capacity. He had compound comminuted fractures of both bones of the left lower leg and a compound fracture of the right femur; he was in the hospital for five months following the accident and for shorter periods intermittently thereafter and was subjected to several operations in order to reduce the fracture of the femur and for the grafting of bone and skin. Fortunately there has been excellent union at the site of the fracture of the femur although there is a shortening of the right leg from a half inch to an inch; motion of the left ankle and flexion of the right knee are slightly limited. Notwithstanding these impairments there is nothing in plaintiff's present physical condition to interfere with the performance of his regular work, and, as already stated, there is no claim for diminution of earning capacity. His loss of wages was $1750 and his medical expenses were $3512.60. The award in excess of $5262.60 represented, therefore, the items of pain, suffering and permanent deformity. On the whole, we are of opinion that the verdict should be further reduced to $20,000.

As thus modified the judgment is affirmed.