Fuller *v.* Pennsylvania Railroad Company, Appellant.

Argued March 24, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Bruce R. Martin*, with him *Dalzell, Pringle, Bredin & Martin*, for appellant.

*Ralph S. Davis, Jr.*, with him *Evans, Ivory & Evans*, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, June 24, 1952:

The sole issue in this case is whether there was sufficient evidence on which the jury could have found that defendant was negligent. After a jury verdict in favor of plaintiff for $2,000, the court of common pleas denied defendant's motion for judgment *non obstante veredicto* and judgment was entered on the verdict. On

appeal the Superior Court affirmed and this Court granted an allocatur.

In the early afternoon of October 6, 1948 plaintiff, while riding in the first coach of an interstate passenger train and (according to his testimony which was disputed), going from Pittsburgh to Beaver Falls, Pennsylvania, was injured when the train struck a fall of rock approximately 350 to 400 feet west of West Bellevue Station. Plaintiff at the time was riding on an employe's pass and, by its verdict, was found by the jury to have been on an intrastate trip.

Plaintiff first produced as witnesses two police officers who testified in substance that they heard the crash and, upon arriving at the scene, they observed rocks along the side of the right-of-way and that some of the rocks in the cut through which the railroad passed were about five or six feet from the track. Officer Andres testified that between the dates of July 7, 1948 and October 6, 1948 he saw rocks along the tracks about two or four inches to a foot in diameter. He said that he never saw any water coming from the hillside near where this accident occurred. He said that he noticed cracks in the hillside but would not say that they were near the place where the accident happened. Officer Gibbs testified that there was a five or six foot clearance between the trains and the rock formation and that on previous occasions he saw rocks at least a foot in length lying in the ditch alongside the track. He further testified that he saw longitudinal cracks in the rocks but that he couldn't be sure that they were in the particular area of the fall and he had seen water seeping from the cracks which would freeze in the wintertime and form ice.

The next witness for the plaintiff was Robert S. Stewart, a geologist, who a few days before trial examined the area and made a sketch or cross-section of the rock formation there present. This sketch showed

a formation of sandy shale at the bottom, an area of about 10 or 12 feet of massive sandstone immediately on top of that, another small area of sandy shale, a large area of broken sandstone which was in slabs averaging 4 or 5 inches, and then sand, gravel, soil and filled ground on the top of the hill which formed the cut.[1] He estimated the hill to be 85 feet high. He explained generally that in any case where rock is exposed over the years weathering takes place in that the water seeps down through the cracks in the rocks and in freezing and thawing forces the rocks to have larger cracks between them and eventually fall. Stewart said that *when he examined the formation* he saw water where the fall had taken place.[2] Upon being asked, "Would the fact that these rocks may fall down after weathering and erosion be apparent to anyone walking along the track?", he replied, "I would say that a qualified observer should be able to pick out the probable places. He couldn't say when it would fall." He was then asked to explain what he meant by "qualified observer" and replied, "Someone who is familiar with the action of an open face or an open cliff."[3]

Hugh F. Baird, an employe of the defendant as fireman and engineer, called by the plaintiff, testified as follows: He was an engineer on trains which operated through this area and was riding in the first car be-

---

[1] It did not appear whether the "cut" was natural or artificial. It had existed for at least 40 years, without incident.

[2] This was nearly 2 years after the accident occurred.

[3] This testimony was directed to the sloughing off of small pieces of rock from the slab-like type of rock which formed the stratum above the massive heavy rock. Plaintiff's witness Sipe, supervisor of track, who had been in charge of the inspection of the cut and other cuts in this section of the right-of-way, for 14 years, testified to the daily observance of the cut by defendant's employes and to periodic tests and scaling operations on the face of the cut.

hind the engine on the day of the accident. The train at the time was going between 60 and 65 miles an hour. He estimated the distance from the cab of the engine to the hillside as varying between 6 feet and 30 feet. He stated that the defendant in other cuts had erected signal fences (later referred to by other witnesses as slide fences) but that none had been placed on the hills in this cut. He also stated that he had seen rocks lying in the ditch beside the track at different times. On cross-examination he said that the block signal was better than one-half mile from the place where the wreck occurred, that he had seen men scaling the loose rock, that he did not know how the loose rocks got in the ditch and that he had never seen rock blocking this track before.

Herbert C. Atkins, chairman of public safety for the Borough of Bellevue, and a former fireman and engineer for the railroad, testified concerning the operation and use of slide fences. He described them as netting stretched between two posts which was connected to either a wayside or bridge signal and if a rock rolled against the netting a cautionary signal would appear on the wayside or block signal. On cross-examination he admitted that this slide fence would not prevent an accident if the slide occurred after the train passed the signal to which the slide fence was connected.

The next witness for the plaintiff was Clinton P. Sipe who was the supervisor of track for this area employed by the defendant. He stated that the height of the cut was 100 to 120 feet. He gave the distance from the track to the side of the cut as varying between 8 and 20 feet. He said about 85 tons of rock fell at the time of the accident. Regarding slide fences, Sipe stated that none were erected in this area. He said that there was a spring about 200 feet west of the

point of the slide and explained that during heavy rains he had reports of rocks falling *from the clay soil on the top of the hill* but never had a report from anyone of stones or rocks *falling* from the face of the cut. At various times, he testified, men scaled the loose rock from the cut. The last time this area was scaled was June 26th but it had been "tested" on October 4, 1948, two days before the accident, and the men who were working there at that time ate their lunch under an overhang of rock of about 3½ feet[4] which was near the point of the slide and which fell at the time of the slide. He described the scaling operation in detail and testified that after scaling, the rocks which were taken from the hillside were placed in the ditch along the tracks and that periodically a train would clean out the ditch, thus accounting for the rocks seen there. He testified that employes of the railroad company known as the hillside gang visually inspected the hillside at the cut twice a day; that there was also a daily track walker and a daily hillside cut watchman; that he, Sipe, made visual inspections averaging once a week, his last inspection before the accident being on Septem-

---

[4] This witness testified that there was erosion underneath this overhanging rock. A fair reading of his testimony indicates that he was referring to the recess in the bottom stratum that accounted for the overhang. The condition of the stratum underneath the massive rock that fell was not relied on as the cause of the slide. On the contrary, plaintiff relied on the widening of cracks caused by the alternate freezing and thawing of percolating water. In his brief plaintiff states that the witness Sipe saw vertical and horizontal cracks at the point of the overhang, quoting his testimony. Neither this nor any of the witness' testimony bears out this statement. Sipe testified that you could find such cracks if they were there, but expressly negatived their existence. He said that while you could see a "hair-line" showing the union between the two strata, there were no vertical or horizontal cracks. He also testified that ice had never formed on the cliffside at this point.

ber 17th when he saw nothing to indicate any likelihood of rock falling. It appeared that these inspections by employes were regularly made and covered other locations along the right-of-way wherever the rock strata and conditions required. *After the accident,* according to this witness, a crack appeared 6½ feet back of the face of the heavy rock that had fallen out and a scaling operation removed the loose rock near the crack. Sipe expressly testified there was no known method of discovering this condition. It was a latent defect: See *Philadelphia Ritz Carlton Co. v. Philadelphia,* 282 Pa. 301, 304, 305, 127 A. 843.

At the conclusion of Sipe's testimony, plaintiff rested as to liability. Defendant moved for compulsory non-suit and plaintiff moved to reopen the case in order that he might call as an expert witness William P. Braun, a civil engineer. Defendant's motion was denied and plaintiff's motion granted. Braun testified that he made an examination of the area during the interlude in the trial which was almost two years after the accident. He said that he found a dampness in the area where the slide occurred. Braun stated that there was a method to prevent a rock slide by building a concrete facing wall or revetment wall and that this method had been used before where roads and railroads went through cuts. He was then asked the following hypothetical question: "Mr. Braun, assuming that there was a rock slide of 85 tons on October 6, 1948, that previous thereto rocks had been found in the 6-foot area or ditch at the base of the cliff, that rain and rainstorms had brought down some rocks over the face of that cliff, that horizontal and vertical cracks appeared in the face of the cliff, that inspections were made periodically, that men were lowered over the cliff to scale it or take down loose rocks, that these rains which brought down rock over the top of the hill occurred five or six times between 1934 and 1948, that

track-walkers made an inspection during the day and hill watchers made inspections during the night, that damp spots appeared in various parts of this hillside, can you give us an opinion as to whether any steps were necessary to prevent a rock slide?[5] A. I think I can. Q. What preventive measure do you suggest? A. Well, from all the facts it seems to me that something should be done to remedy the situation and the only thing that would have remedied it is this facing wall I have spoken of, revetment wall."

On cross-examination he said that he could not tell whether or not the "cracks" which appeared in some of the photographs introduced as exhibits were in the rock before the slide took place. He admitted that he did not know for what distance in the cut it would be necessary to extend the facing wall and therefore did not know what the cost of such wall would be. Nor did he know how many miles of similar hillside were along this division of the railroad. The cut in question was a half mile in length and there were a number of other cuts. When plaintiff made his offer of proof for the reopening of the case, it was stated that Braun would testify that the rock slide could have

---

[5] This hypothetical question was based on dubious, if not unwarranted assumptions. The presence of rocks in the ditch was explained by plaintiff's own witnesses who testified that they were placed there by the scaling crew for future periodic removal. There was no testimony that any rock fell from the face of the cliff prior to the accident. It is difficult to see how the fact that on six occasions during 14 years, rains had caused some rocks to be washed down from the soil on the surface of the hilltop, had any relation to or bearing on the stability of the rock stratum near the bottom. There was testimony of horizontal "cracks" that were apparently seams or crevices characteristic of the whole area but the only vertical crack definitely established at the point of the slide was the one appearing after the fall 6½ feet back of the face of the fallen rock.

been anticipated and prevented by a revetment wall *at relatively small cost.* It is patent that plaintiff did not sustain his offer of proof.

The plaintiff, as an employe riding on a pass on an intrastate journey, had the burden of proving negligence on the part of the railroad: *Turek, Admrx., v. Pennsylvania Railroad Company,* 361 Pa. 512, 64 A. 2d 779. In our opinion plaintiff's proof considered in the most favorable light was not sufficient to allow the jury to infer want of due care. Plaintiff relies in this appeal upon five theories of negligence, (1) the defendant had notice of rocks coming down the hillside and took no adequate steps to prevent them coming upon the tracks; (2) a revetment wall should have been erected; (3) there was inadequate inspection and maintenance of the hillside; (4) there should have been a warning slide fence; (5) defendant should have relocated its tracks farther away from the hillside.

In support of the first two related theories which may be considered together, plaintiff relies upon the testimony recited at length above to the effect that rocks fell before this accident and the testimony of Braun concerning the advisability of using a revetment wall. There was evidence that rocks loosened by rain from the surface of the hilltop had fallen on a few occasions and of precautionary removal of loose rocks from the face of the hillside, but no evidence that any rocks had ever fallen from the face thereof. This could hardly be considered to be notice to the defendant that this particular portion of the cut needed a revetment wall. Included in the hypothetical question asked the expert witness Braun was the fact that the rock fall in question had occurred. It would take no expert to say that since this slide had happened, it might have been better if the railroad company had placed a revetment wall in this particular place. But that was not the question in issue. The question in order to deter-

mine negligence was whether before the accident the condition was such that the defendant should have known that a revetment wall was necessary. There was no evidence that any slide of this magnitude had ever occurred before. In fact, plaintiff's case affirmatively proved that there was no previous slide of any kind. On cross-examination Mr. Braun testified, "Q. If every foot of this particular hillside were inspected closely and showed no signs of a rock fall and no rock fall had ever occurred at that spot, would you still say that was the spot to build a revetment wall? A. No, I wouldn't. I would say it depends on the reports of those inspections." In addition to this he admitted that he did not know over what area it would be necessary to build this revetment wall and thus did not know the cost. Such wanting evidence was certainly an integral part of the proof of negligence in this regard.

As to the third theory of inadequate inspection and maintenance, the plaintiff relies upon the testimony of Sipe. But this witness who was called by the plaintiff, described in detail how a foreman and four men would go out periodically and while one man stayed at the bottom of the cliff two or three men would go to the top. These men at the top would then be lowered over the face of the hill by ropes (the ropes were a safety measure since the slope of the hillside afforded a footing) and with a jimmy bar would probe for any rocks that were loose. If there was any move or "give" to a rock, it was removed. This, together with the constant obversation above described, certainly was an adequate inspection. Plaintiff suggested no other. Even though Sipe was defendant's employe since such evidence was produced in the plaintiff's case and was uncontradicted, there was no jury question regarding the credibility of the testimony concerning inspections: *Peters v. Shear,* 351 Pa. 521, 523, 524, 41 A. 2d 556.

Plaintiff seems to admit this but further relies upon the fact that the last scaling operation at this point was in June, 1948 and argues that since the slide occurred in October, 1948, the jury could infer negligence by the lapse of time between the last scaling operation and the time of the accident. But the record also shows by plaintiff's witness that the area where this slide occurred had been tested just two days before this unfortunate slide happened and the plaintiff produced no evidence from which the jury could have found that this inspection was inadequate.

Plaintiff relies on the case of *McCarthy v. Ference,* 358 Pa. 485, 58 A. 2d 49, where this Court upheld a verdict for the plaintiff against a landowner whose land abutted on a highway when a huge rock fell on the highway and struck the side of a bus. However, in that case this Court in summarizing the evidence said, pp. 491, 492: "Warnings were numerous. A multitude of witnesses testified that from 1928 when the road was opened until 1942 when the accident happened there were numerous land slides and falls of rock upon the highway, some comparatively slight in volume but others of sufficient magnitude to require the temporary closing of the road to traffic in whole or in part . . . the street obtained a notorious reputation as a dangerous highway . . .". The obvious distinction between that case and the one involved here is that plaintiff in this case proved no warnings to the defendant. In addition, in *McCarthy v. Ference,* supra, there was evidence that the landowners prevented the Public Works Administration from removing the loose rock from the hill. On the contrary, in the instant case the plaintiff proved by his own witness, Sipe, that the defendant conducted periodic inspections and when it was necessary, removed any loose rocks by scaling operations. Thus defendant complied with the duty of rea-

sonable inspection unlike the defendants in the *Mc-Carthy* case.

In his fourth theory of negligence plaintiff suggests that defendant should have installed a slide fence and relied on testimony that a slide fence had been considered. But this witness Sipe affirmatively testified that there had been no consideration of the advisability of a slide fence at this cut but at a cut a mile and three-quarters to the west where the hillside was only three feet from the tracks. Sipe, by whose testimony plaintiff was bound, testified that there was nothing in the formation of the cut that warranted the erection of a slide fence. Moreover plaintiff adduced no evidence that a slide fence which does not function as a support but is only a signal device, would have averted the accident. The train was traveling from 60 to 65 miles per hour, testified to be its normal speed. From the testimony of plaintiff's witness Baird, there was a sudden application of the brakes and plaintiff imputes no negligence to the engineer. There was nothing to rebut the inference that the fall of rock occurred when the train was practically upon it. A slide fence is ineffective if the train has passed the block or wayside signal which the slide fence is supposed to automatically operate.

Appellee in his brief does not emphasize the suggested slide fence. This is understandable. At the conclusion of the trial judge's charge, in answer to the latter's inquiry of plaintiff's counsel whether there was anything to be added or corrected, counsel stated: ". . . The basis of the negligence contended on the part of the plaintiff is not that the train could have been stopped before that landslide came down. We do not contend there was any negligence in the operation of the train. We contend that the negligence was in the maintenance of its way, or hillside." The court then

charged the jury: "Yes. Mr. Davis has called attention to something that I think I rather made some comment on. It is not charged there was any negligence in the operation of this train that was involved in the accident . . . . Mr. Davis: That is right. The Court (to the jury): The plaintiff says it was failure to prevent rock from coming down on the track. Mr. Davis: That is it."

There remains plaintiff's theory that the close clearance between the tracks and the hillside required the railroad company to relocate its tracks. This needs little comment. Plaintiff's complaint did not specifically charge negligence in this respect and no evidence was adduced that relocation of the tracks was feasible or would have prevented the accident. The trial judge did not submit to the jury any question as to whether the defendant should have moved its tracks away from the hillside, and plaintiff's counsel did not request that he do so, when, as above pointed out, the trial judge inquired whether counsel wanted anything added or corrected in the charge to the jury.

We conclude our consideration of this case with the apt language of Mr. Justice BROWN (later Chief Justice) in *Kilbride v. Carbon Dioxide and Magnesia Company*, 201 Pa. 552 at p. 557, 51 A. 347: "In Northern Central Railway Company v. Husson, supra, it was said: 'Almost all accidents could be avoided if the especial manner of their occurrence could be foreseen;' and we may add that, after almost every one, theories are advanced as to how it could have been avoided; but a defendant's liability for negligence is not to be so determined. What would have been wise, simply in view of what is learned after an occurrence like this, is no criterion of care. Failure to do some particular thing which might have prevented an accident, and which is brought to the attention of the party charged

with carelessness for the first time only after the accident has happened, is not the test of negligence; the standard of proper care is the observance of prudence as the average prudent man observes it, by following the ordinary usage of his business: Titus v. Railroad Company, supra. If, having exercised such prudence, unforeseen accidents occur, negligence cannot be imputed to him."

Judgment reversed and here entered for the defendant.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

This is another instance (cf. *Lanni v. Pennsylvania Railroad Company*, 371 Pa. 106, 88 A. 2d 887) where this court overrules the Superior Court's appraisal of the evidence in a personal injury suit on an appeal falling within the jurisdiction of that court. No justification is apparent for according the defendant a further appellate review. The result affects no one other than the parties to the suit and therefore does not justify the allocatur. I would terminate the litigation without going into the merits by affirming the judgment of the Superior Court.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The plaintiff in this case, an employe of the Pennsylvania Railroad Company as a redcap porter for 22 years, was travelling as a passenger on a train of the defendant company on October 6, 1948, from Pittsburgh to Beaver Falls, Pennsylvania, when, obviously through no fault of his own, the train ploughed into 85 tons of rock which had fallen from a cliff skirting the track over which the train proceeded, and, as a result of the collision, several people were killed and many injured.

The plaintiff sued the railroad company for the injuries sustained by him, averring negligence in the maintenance of the right of way. The jury found that the defendant was negligent and returned a verdict for the plaintiff in the sum of $2,000. The defendant moved for judgment notwithstanding the verdict before the trial judge and two other judges, and the motion was refused. The defendant then appealed to the Superior Court and renewed its argument for judgment n.o.v., and the Superior Court affirmed the judgment of the lower court. The railroad company now appeals to this Court to reverse the Superior Court, the court en banc and the jury on the theory that the plaintiff failed to prove negligence on the part of the defendant.

I need not belabor the elemental rule that, in considering the defendant's appeal, in view of the verdict in the court below, we are required to read the testimony in the light most advantageous to the plaintiff and he must be given the benefit of every fact and inference of fact fairly deducible from the evidence. (*McCracken v. Curwensville Borough,* 309 Pa. 98.)

The facts are readily observable from the Majority Opinion. For a long time prior to the accident, loose rocks a foot in diameter were seen lying in the ditch alongside the railroad track over which the train carrying the plaintiff travelled. Cracks were observed in the wall of the cliff which was 85 feet high. It was testified that where rock is exposed over the years, the action of water, ice and alternate freezing and thawing causes the rock to crack and split with the result that portions break away and fall. Not only did the hillside involved in this accident approach the track as closely as 6 feet, but at one point a huge rock (which fell at the time of the accident) projected out with such prominence that at times men gathered beneath

the overhang to eat their lunch. Added to this evidence there was the testimony of an expert witness who categorically stated that the accident would not have occurred if the railroad company had taken the necessary precautionary measures.

The jury could have inferred, and undoubtedly did infer, that when the railroad company's employes saw the rocks alongside the tracks, observed the cracks in the hillside wall, and knew that erosion, weather and spring water would loosen the rock, it should have taken such reasonable precautions as would have avoided the dreadful accident which was foreseeable. Nature's handwriting on the wall of the cliff overlooking the Pennsylvania Railroad track offered warning of impending disaster as dramatically and prophetically as the historical handwriting on the wall announced to Belshazzar the warning of catastrophe to his kingdom.

The railroad company could have avoided the accident of October 6, 1948 in many ways. It could have scaled down the overhanging and pendent rocks, widened the passage alongside the cliff, erected slide fences which would have warned approaching trains of an incipient slide, moved the track further away from the hillside or it could have built a revetment which would have imprisoned the loose rock behind concrete. It is no defense to say that building a revetment wall would have entailed expense. It costs money to build bridges, culverts and signal systems of safety. Those expenditures all go into the cost of maintaining a railroad. Money is needed to dig tunnels and to support the roofs of those tunnels. Could it be argued against a tunnel cavein due to faulty support that it would cost too much to hold up the ceiling? No railroad has the right to build its tracks in such a manner and over such a route that it kills people and yet escape re-

sponsibility on the theory that it would cost too much to erect the necessary barriers of safety. As lightly as human life is sometimes regarded in the economic and military wars of the age, it has not dropped to so cheap a level that it can be compared in value to the cost of a few mixersful of cement. A railroad has no more right to run its train by a cliff which threatens a rock bombardment than it has to run it by an artillery target range firing cannon projectiles across its tracks.

The Majority Opinion states that there was no evidence that any slide of this magnitude had ever occurred before. The plaintiff was not required to prove that there had been a previous landslide any more than he was required to ride the cowcatcher of the engine to test the track, or to make inquiry of passersby as to the condition of the hillside. All that can be expected of a passenger who has been injured and who certainly had the right to assume that every reasonable precaution had been taken to avoid injuring him, is that he prove the circumstances enclosed within the orbit of the accident and then let the law determine the responsibility. This the plaintiff has done, and on those circumstances a jury has declared the defendant company negligent.

There is scarcely a situation where a human being can be in a more helpless situation to protect himself from the negligence of others than when he is being transported in a public conveyance. It is for that reason that a railroad (as well as other public conveyors) owes the highest degree of care to its passengers. A railroad passenger is in effect an imprisoned hostage as he is being carried in a steel train in whose management or direction he has no voice, over a track he does not see and over a terrain which, so far as his jurisdiction is concerned, could be a foreign country. What more could the plaintiff do than he has done in this case?

The Majority Opinion states that the plaintiff's case affirmatively proved that there was no previous slide *of any kind.* And in substantiation of this utterance the Opinion quotes from Witness Braun's testimony as follows: "Q. If every foot of this particular hillside were inspected closely and showed no signs of a rock fall and no rock fall had ever occurred at that spot, would you still say that was the spot to build a revetment wall? A. No, I wouldn't. I would say it depends on the reports of those inspections." I fail to see how this proves that there had not been a slide *of any kind* before. The question of the defendant's attorney began with an IF, and he never did show that "every foot of this particular hillside" had been inspected closely.

In point of fact the record shows conclusively that there had been previous slides. Assuredly the plaintiff is entitled to the inference that the rocks in the ditches alongside the tracks slid down from the hillside. He was not required to prove that the loose rocks did not *grow* in the ditches!

Furthermore, one of the railroad employes, a track foreman, testified that rocks were "falling down from the top of the hill." He also testified to the presence of a spring 200 feet west of the point of the slide and that rocks were "washed out of the clay formation on the extreme top of the hill and had rolled down."

*McCarthy v. Ference,* 358 Pa. 485, 58 A. 2d 49, is, in my opinion, absolute authority for the sustaining of the verdict in this case. The Majority Opinion, in attempting to distinguish that case from the one at bar, declares that here the plaintiff "proved no warnings to the defendant." There can be no more direct and effective warnings than Nature's warnings. The person who ignores a lowering and darkening sky, flashes of lightning, gusts of wind and growlings of

thunder cannot reasonably complain about a drenching if he has not sought shelter from the storm whose approach has been heralded in every grain of dust and bending blade of grass. To demand of this plaintiff anything more than he presented to establish notice to the defendant of the impending fall of rock is to demand what reason does not ask, what the law does not expect and what justice can only regard as unfair.

While one should not wait for a star of precedent to which to hitch one's wagon of judicial responsibility, provided his own appraisement of the facts and the law impel him to but one conclusion, it is always comforting and reassuring to know that somewhere and at some other time someone else, with an equal responsibility, has come to a conclusion similar to the one which has taken up an insistent abode in our being and in our own reasoning processes. In the case of *Gleeson v. Virginia Midland Ry. Co.*, decided in 1891, (11 Supreme Ct. Reporter, 859, 35 Law Edition 458), a postal railway clerk was injured when the train on which he was a passenger struck a landslide and was wrecked. Justice LAMAR, writing the opinion for the Supreme Court of the United States, said: "Just as surely as the laws of gravity will cause a heavy train to fall through a defective or rotten bridge to the destruction of life, just so surely will those same laws cause land-slides and consequent dangerous obstructions to the track itself from ill-constructed railway cuts. To all intents and purposes a railroad track which runs through a cut where the banks are so near and so steep that the usual laws of gravity will bring upon the track the debris created by the common processes of nature is overhung by those banks. Ordinary skill would enable the engineers to foresee the result, and ordinary prudence should lead the company to guard against it. *To hold any other view would be to over-balance the priceless*

*lives of the traveling public by a mere item of increased expense in the construction of railroads;* and after all, an item, in the great number of cases, of no greater moment." (Italics supplied)

And with that quotation from the opinion of one of the distinguished jurists in the history of the courts of our country I rest my dissent.