## Miner v. Glen Alden Corp.

Before Pinola, P. J., Brominski, Bigelow and Schiff-man, JJ.

*Patrick J. Toole, Jr., Arthur Silverblatt, John L. McDonald,* and *Charles H. Miner,* for plaintiffs.

*Franklin B. Gelder, Joseph L. Reynolds, 3rd,* and *Henry Thalenfeld,* for defendants.

BIGELOW, J., July 14, 1966.—In these two actions in assumpsit, consolidated for trial before Bigelow, J., without a jury, plaintiffs, the present owners of .64556834 of the total lessor interest in the "John S. Law" coal lease executed in 1875, brought suit for unpaid royalties allegedly due and owing by the terms of

this lease. After making 53 findings of fact and 6 conclusions of law, the trial judge entered the following:

## ORDER

"NOW, this 21st day of APRIL, 1965, at 2:00 P.M., E.S.T. the Prothonotary is directed to enter judgment for the plaintiffs and against the defendants in the amount of $33,892.35 plus interest, unless exceptions are filed hereto within thirty (30) days after notice of the filing of this adjudication, said notice to be given by the Prothonotary to the Attorneys of record forthwith".

Plaintiffs filed exceptions to 10 of the court's findings of fact, to the court's definition of "merchantable coal", to the court's refusal to find 19 of plaintiffs' requested findings of fact, to four of the court's conclusions of law, and to the court's refusal to approve six of plaintiffs' suggested conclusions of law. Defendant Lehigh & Wilkes-Barre Coal Company filed exceptions to three of the court's findings of fact, four of the court's conclusions of law, and to the court's order. Glen Alden Corporation filed exceptions to three of the court's findings of fact, to two of the court's conclusions of law, and to the court's order.

The basic provisions of the coal lease in question are summarized in finding of fact no. 28, to which no exceptions were filed, and it is quoted hereinafter verbatim:

"28. On March 12, 1875, the predecessors in title of the several plaintiffs entered into a lease hereinafter referred to as the 'Law Lease', (Plaintiffs' Exhibit #1) with The Lehigh & Wilkes-Barre Coal Company, a corporation, one of the defendants, whereby lessors did 'lease, demise and mine—let' to lessee, its successors and assigns, *all the merchantable coal* owned by lessors, underlying approximately 390 acres of land *'until all the merchantable coal shall have*

*been mined and removed from said premises'.* Lessee undertook to *mine and remove or pay for all the merchantable coal therein demised,* to pay a rent or royalty at the rate of 25¢ per ton of 2240 pounds, and *to mine and remove or pay for all the merchantable coal at this rate per ton until all the merchantable coal shall be exhausted.* In addition, the lessee undertook to pay stipulated mine rents or royalties annually *for all merchantable coal mined and removed during* the period ending October 1, 1881, and *for every year thereafter until all the merchantable coal shall be exhausted,* a mine rent or royalty of not less than $35,-000.00 to be paid in two installments on the first days of April and October *whether such coal shall then have been mined or not.* The lease provided that nothing contained therein gave to lessors any right to any portion of the surface overlying the leased coal for any purpose whatsoever except for necessary air shafts under specified conditions. The lease further provided that if in any year less coal were to be mined than paid for the deficit might be mined and removed in any subsequent year during the continuance of the lease without further payment, provided, however, that said coal be taken in excess of the annual quantity, stipulated as aforesaid, to be mined and removed. The lease further provided for the conduct of the mining operations in a careful and workmanlike manner, required that pillars be left for surface support, that certain records be kept by lessee, that the mines at all times be open to the lessors, that all taxes on the demised premises or the coal produced therefrom be paid by lessee, that the lease not be assigned or sublet by the lessee without the written consent of the lessors, provided for an option in lessors to declare forfeiture upon lessee's default in any of the covenants of the lease, appointed the Cashier of the First National Bank of Wilkes-Barre as attorney and agent to receive and distribute

the royalties paid, and provided that *when all the merchantable coal,* according to the terms therein provided, *shall have been mined and removed and paid for, the premises or mines demised shall be restored to the lessors,* or their legal representatives, in a good, safe and proper condition (Italics supplied). By agreement dated June 30, 1879, defaults in rentals due to April 1, 1880, were compromised, lessee then being in receivership, but the original lease otherwise to remain in full force and effect. (Plaintiffs' Exhibit #1a)". (Decision, pp. 5, 6.)

The basic objections of plaintiffs to the court's decision are directed to finding of fact no. 49, and to conclusion of law no. 5. These are quoted verbatim hereinafter:

Finding of fact no. 49:

"49. Subsequent to 1961, and the closing of the Woodward Colliery, the coal remaining in the Law tract was unmerchantable, *but prior to the abandonment of this Colliery Glen Alden could have mined and sold at a profit the coal from the Law tract with coal from other mines through Woodward Colliery, and thus until the closing of the Woodward Colliery in 1961 the Law Lease coal was merchantable"*. (Decision, p. 10.)

Conclusion of law no. 5:

"5. From and after May 19, 1961, the merchantable coal in the Law Tract then having been mined and removed and paid for, the 'Law Lease' obligation of The Lehigh & Wilkes-Barre Coal Company to pay any coal royalties terminated at the end of 1961". (Decision, p. 18.)

Defendant Lehigh & Wilkes-Barre also filed exceptions to conclusion of law no. 5. Both defendants filed exceptions to the italicized portion of finding of fact no. 49. Plaintiffs also filed exceptions to the court's conclusion that, as used in this coal lease, the term

"merchantable coal" means "coal which is ordinarily used for sale and can be usually sold at a profit". (Decision, p. 11). This definition was adopted by this court in Genelow Mining Co. v. Panzitta Mining Co., 51 Luz. 255, and by the Supreme Court of Pennsylvania in Rinehimer v. Lehigh & Wilkes-Barre Coal Company, 416 Pa. 216. Plaintiffs maintain that these two decisions are inapplicable to the present cases, and that the term "merchantable" as used in this lease refers only to quality without any consideration of the profit factor. The definition adopted in the present case is that stated in 58 C.J.S., Mines and Minerals, §2. While, as plaintiffs maintain, it is a general principle that ". . . it is the intention of the parties *at the time of entering in thereto that governs,* and such intention is to be gathered from a reading of the entire contract . . ." (Wilkes-Barre Township School District v. Corgan, 403 Pa. 383, 386), it is also a general principle that "the interpretation which makes a rational and probable agreement must be preferred": Percy A. Brown & Co. v. Raub, 357 Pa. 271, 287. That the parties contemplated the subject of the lease, "merchantable coal" to mean coal which could be mined profitably and that this term should have economic ramifications as well as those relating to quality alone is demonstrated by the modification agreement, plaintiffs' exhibit 1A, dated June 30, 1879, whereby rental defaults were compromised while lessee was in receivership. The Pennsylvania Supreme Court has stated:

"The court below has found that certain outcrop coal within the lines of No. 3 mine is not merchantable, and cannot be worked at an expense practicable in a business sense, and it therefore need not be removed by plaintiff, as such course could not have been within the contemplation of the parties, and with this conclu-

sion we agree: . . . Commercial Coal Mining Co. v. Big Bend Coal Mining Co., 293 Pa. 39, 43".

The "Law Lease" prohibited the use of the surface for access to the coal and permitted only limited use of this surface for necessary air shafts and this only under specified conditions. See finding of fact no. 28, supra. It was, therefore, the intention of the parties to the original lease that access to the coal had to be through other properties. Lehigh and Wilkes-Barre's access to the coal was through use of its South Wilkes-Barre and Lance Collieries, while Glen Alden's access, since 1930, was through these two collieries and its own Woodward Colliery. See finding of fact no. 41. Even accepting plaintiffs' definition of "merchantable coal" as that which is "fit for market and sale" (Commercial Coal Mining Co. v. Big Bend Coal Mining Co., supra, 293 Pa. 39, 42), it cannot be maintained that coal which cannot be mined is "fit for market and sale", particularly where, as here, it is a limitation imposed upon lessees by lessors which ultimately makes it impossible for lessees to mine and sell the coal on the market. If lessees were not denied the use of the surface, plaintiffs might be able to demonstrate the practicability of alternate methods of mining the coal. However, defendants amply proved the reasons for the abandonment of these three collieries, as set forth in the findings of fact. The court does not determine that the test of merchantability rests solely on whether the coal can be mined and sold profitably, but also considering this as one of the elements, together with the test of quality, has further concluded that the coal cannot be mined, as defendants have no facilities through which to remove the coal, particularly in view of the closing of the Woodward Colliery by order of the State Department of Mines of May 19, 1961. See further discussion of this finding of fact and conclusion of law, infra.

Plaintiffs' and defendants' exceptions to the court's findings of fact will be considered seriatim:

"29. Defendant The Lehigh & Wilkes-Barre Coal Company paid the minimum royalties to and including that payment due April 1, 1960, and has paid no royalties since that date".

This finding of fact was excepted to by plaintiffs. Plaintiffs do not refer to this exception in their brief, but it is undisputed that minimum royalties were paid to April 1, 1960, and that these payments were made through the shell of Lehigh & Wilkes-Barre Coal Company. It is also undisputed that no royalties have been paid since that date. See amended complaints, paragraphs 10 and 11, and the admissions thereto by defendants. This exception will be overruled.

"32. Because the lessors forbade the use of the surface for usual mining needs such as shaft digging, breaker building, rock dumping and the like, the demised area was a captive property and could not be mined by itself, but only in dependence upon other mines and collieries of defendant-lessee, The Lehigh & Wilkes-Barre Coal Company".

Plaintiffs have excepted to this finding of fact. This exception is not referred to in plaintiffs' brief. The terms of the lease, as set forth in finding of fact no. 28, supra, clearly denied Lehigh & Wilkes-Barre Coal Company any access to the coal through the surface overlying this coal. Therefore, the lease envisioned that this coal would be mined through mines and collieries controlled by Lehigh & Wilkes-Barre outside of the boundaries of the leased tract. This exception will be overruled.

"33. Defendant-lessee, The Lehigh & Wilkes-Barre Coal Company, had access to the coal of the demised area only through two of its collieries, namely: South Wilkes-Barre Colliery and Lance Colliery".

Plaintiffs have excepted to this finding of fact. The testimony clearly establishes that Lehigh & Wilkes-Barre Coal Company had access to this coal only through its South Wilkes-Barre and Lance Collieries. There is no evidence to the contrary in the record, and plaintiffs do not refer to any in their brief nor is this exception discussed therein. This exception will be overruled.

Plaintiffs have excepted to a portion of finding of fact no. 37, which is as follows, their exception being to the italicized portion thereof:

"37. *Because there was no consent of the lessors to assignment of the subject lease, defendant-lessee, The Lehigh & Wilkes-Barre Coal Company, made no attempt to assign the same to Glen Alden, but entered into a mining agreement whereby Glen Alden was to mine the coal for the said lessee and was to receive fifteen percent (15%) above the cost of mining from the lessee.* This mining agreement, dated December 31, 1929, by its terms, employed Glen Alden as mining agent or miner, and required that Glen Alden was to keep an accurate account of the cost of mining and preparing the mined coal and to submit a monthly statement to The Lehigh & Wilkes-Barre on the basis of which payment would be made to Glen Alden. The mining agreement also required Glen Alden to deliver the prepared coal to The Lehigh & Wilkes-Barre or its assigns at the mines at which said coal was mined and prepared. (Plaintiffs' Exhibit #15)". (Italics supplied.)

Plaintiffs' exception evidently is to the court's conclusion as to the reason this "mining agreement" was entered into between Glen Alden and Lehigh & Wilkes-Barre. In their argument brief, plaintiffs do not specifically argue this exception, except to note that it was the device whereby Glen Alden secured control of the Law lease tract, and ultimately thereby retained

the profits from this tract without accounting to Lehigh & Wilkes-Barre. Glen Alden purchased all of the physical assets of Lehigh & Wilkes-Barre on December 31, 1929 (finding of fact no. 35). On the same date, the "mining agreement" was entered into between the same companies embracing, first, six leased tracts; subsequently, five tracts, including the Law tract. By means of this "mining agreement", Glen Alden obtained access to and the right to mine the Law tract. Without this agrement, Glen Alden would have had no right to mine the Law tract coal, as the Law lease was not assigned to it. This was a valuable tract, as after the Woodward-Lance barrier pillar was changed, a considerable quantity of coal became available to the Woodward operation of Glen Alden, and, in fact, of the 3,921,800 tons of recoverable coal remaining in this tract on April 1, 1960 (finding of fact no. 30), 2,221,-700 tons were within the Woodward Colliery. Furthermore, the testimony is clear that a form letter was sent to the lessors by Gilbert S. McClintock, attorney, counsel for Lehigh & Wilkes-Barre, to secure consent of the lessors to the assignment of Lehigh's leases to Glen Alden, and that the Law lease was not assigned. Further testimony established that these unassigned leases prevented Lehigh & Wilkes-Barre from liquidating and going out of the coal business. From this testimony, the court's conclusion that the fact that these leases, here particularly the Law lease, were not assigned to Glen Alden was the reason for the "mining agreement" is inescapable.

Furthermore, while normally the court would not consider counsel's argument brief as part of the record, the following excerpt from plaintiffs' argument brief is germane:

"The evidence in the instant case reveals that Glen Alden Corporation was desirous of securing control of all of the assets of Lehigh & Wilkes-Barre Coal

Company . . . that it failed to secure by purchase or assignment all of the assets of Lehigh & Wilkes-Barre, and in December of 1929, purchased all of the assets of that company with the exception of five leases which were not assigned . . . Immediately after the purchase the corporations entered into a 'mining agreement' under the guise of which Glen Alden Corporation secured the exclusive control, direction and authority over the mining operations of the Law tract".

It is quite clear that plaintiffs view plaintiffs' exhibit no. 15, the "mining agreement", as did the court in this finding of fact, and there is no question that the "mining agreement" provided exactly what is set forth in finding of fact no. 37. This exception will be overruled, and the finding of fact will be affirmed.

Defendants have excepted to the italicized portion of finding of fact no. 40.

"40. In 1930, the Presidents of both defendant companies, as a matter of policy, without any other official corporate action, decided to ignore the requirements of the mining agreement that The Lehigh & Wilkes-Barre pay Glen Alden the mining costs plus 15%, and in lieu thereof, decided that Glen Alden would pay The Lehigh & Wilkes-Barre the annual minimum royalty due, the real estate taxes and minor miscellaneous costs. The action of the executive officers was predicated upon the facts that The Lehigh & Wilkes-Barre no longer employed mining personnel and that it was impossible to determine accurately the costs of mining coal in the leased area as this coal was commingled with coal mined from other mines comprising the collieries through which the Law lease coal was mined. *Thereafter The Lehigh & Wilkes-Barre Coal Company was operated by Glen Alden as a department or instrumentality of Glen Alden*". (Italics supplied.)

This exception is basic to defendant Glen Alden Corporation's position that it cannot be held liable for the royalties for the Law lease coal. Both defendant corporations have also excepted to the related conclusion of law no. 1, stated as follows:

"1. The Lehigh & Wilkes-Barre Coal Company, during the period 1930 to 1961 inclusive, has been operated by Glen Alden Corporation and its predecessor, Glen Alden Coal Co., as a department or instrumentality of Glen Alden Corporation and therefore Glen Alden Corporation is legally responsible for the obligations of The Lehigh & Wilkes-Barre Coal Company to plaintiffs herein".

The exceptions to this conclusion of law are discussed infra.

This issue was considered by the trial judge on pages 15 and 16 of the decision. Relying upon Rumig v. Ripley Manufacturing Corp., 366 Pa. 343, and McCarthy v. Ference, 358 Pa. 485, the trial judge concluded that the following facts supported the application of the holdings of these two cases to the instant case: (1) Lehigh & Wilkes-Barre Coal Company has been a wholly-owned subsidiary of Glen Alden Corporation since 1942 (finding of fact no. 46; see defendants' exception thereto, infra, the court's revision of finding of fact no. 46; defendants' respective admissions of the averments of paragraph #5 in plaintiffs' amended complaints; (2) Glen Alden changed the barrier pillar between the Lance (a Lehigh & Wilkes-Barre property including the Law tract) and Woodward (owned by Glen Alden) properties after 1930; (3) the coal from the Law tract was commingled at the breakers with coal from other tracts controlled by Glen Alden, (finding of fact no. 40; (4) the reason for the "mining agreement" (plaintiffs' exhibit #15) was to enable Glen Alden to mine the Law lease coal in 1930, and thereafter (finding of fact no. 37); (5) Glen Alden

did not furnish the monthly statements required by this "mining agreement" (finding of fact no. 39); the "mining agreement" was abrogated by the presidents of the two companies in 1930, after which Glen Alden paid to Lehigh & Wilkes-Barre the annual minimum royalty due, the real estate taxes (obligations of Lehigh & Wilkes-Barre under plaintiffs' exhibit #1; see finding of fact no. 28, supra) and minor miscellaneous costs (finding of fact no. 40), including directors' fees, by an order written by a Lehigh & Wilkes-Barre bookkeeper to Glen Alden; (7) Lehigh & Wilkes-Barre had no income from the sale of coal and had nothing to do with the sale of coal, were out of the coal business, and had no mining employes, officers, offices or furnishings other than those supplied by Glen Alden; (8) Glen Alden was not able, in 1930, to compute the cost of mining Law lease coal as a separate tract operation (this portion of finding of fact no. 40 was not excepted to), and, in fact, was unable to do so subsequent to that date, as the coal was commingled with that from other tracts for processing; (9) thus, Glen Alden's position in 1930 was changed from that set forth in the "mining agreement" of 1929, from that of a "cost-plus 15%" mining contractor, to that of a lessee whose obligation was to pay minimum royalties, taxes, and minor costs through Lehigh & Wilkes-Barre.

As noted in the trial judge's decision, clearly Glen Alden operated the Law tract in conjunction with its fee or other leased tracts, not as a mining contractor in accordance with plaintiffs' exhibit #15, but treated this tract as its own property, and the only function of Lehigh & Wilkes-Barre, after 1930, was to serve as a conduit for the payment of the minimum annual royalties, taxes and other minor costs, all of which were paid in fact by Glen Alden. Furthermore, by virtue of the mining agreement, its ownership of the

three collieries through which the Law coal was processed after 1929, the fact that Glen Alden owned Lehigh & Wilkes-Barre as its subsidiary after 1942, and the fact that Glen Alden furnished not only all the funds but also all personnel necessary to maintain the shell of Lehigh & Wilkes-Barre, the conclusion of the trial judge that Glen Alden operated Lehigh & Wilkes-Barre as its department or instrumentality within the rule of Rumig v. Ripley Manufacturing Corp., 366 Pa. 343, and McCarthy v. Ference, 358 Pa. 485, was supported by the testimony and findings. There is no merit to this exception, and finding of fact no. 40 will be affirmed.

Plaintiffs have excepted to finding of fact no. 42:

"42. In 1956, Glen Alden abandoned the entire South Wilkes-Barre Colliery because of excessive costs, lower realization from sales because of the depressed condition of the anthracite industry and hazardous mining conditions".

This finding is supported by the testimony as to prohibitive costs and heavy losses at this colliery, as to the necessity for flushing the mines in this colliery to support the surface and the necessity for unusual transportation in this colliery. There is no merit to this exception.

Plaintiffs have excepted to finding of fact no. 43:

"43. In 1959, the entire Lance Colliery was abandoned by Glen Alden because of an order of the State Department of Mines requiring the abandonment of portions of the Lance Colliery mines, dangerous caves and steady losses resulting from excessive mining costs".

In support of this finding, the testimony of Mr. Ivor Williams, General Superintendent of Glen Alden Corporation, is that the cost of mining the decreasing available coal in this colliery was about $2 to $3 higher than in some other operations, and that hazardous min-

ing conditions in the nature of squeezes, caves and fire endangering personnel and resulting in loss of valuable equipment resulted in the closing and abandonment of Lance Colliery by Mr. Harold Wickey, Vice President and General Manager of Glen Alden in 1959, following a "stop order" issued by the Federal Coal Mine Inspector and an order issued by the State Mine Inspector. There is no merit to plaintiffs' exception to this finding of fact.

Plaintiffs have excepted to finding of fact no. 44: "44. In 1961, the Woodward Colliery was finally abandoned by Glen Alden after the State Department of Mines on May 19, 1961, issued a stop order closing down Woodward Colliery because of the danger to the barrier pillar caused by the rising water level in the Kingston pool, and further because of excessive costs of mining the coal in this colliery resulting in steady losses. No coal from the leased tract had been mined through this colliery since 1957".

Plaintiffs' exception to this finding is substantially that the rising water level in the Kingston pool was caused by the failure of Glen Alden to pump this area, and thus that Glen Alden cannot claim any benefit in this action from its own conduct. The testimony is clear, however, that the cause of the rise in the water level against the barrier pillar between the Kingston pool and the Woodward Colliery was a major disaster, known locally as the Knox Disaster, that Glen Alden, the surviving partner in a tri-partite pumping agreement known as the "Loree Agreement", operated as many as three pumps in the Kingston operation (an operation of a bankrupt coal company since 1940), but this pumping was futile, and was unable to keep the pressure of water on the Kingston side of the barrier to a level at which the Woodward Colliery could safely be operated, as the result of which the State Mining Inspector ordered the Woodward operation stopped on

May 19, 1961, and that subsequent to this order, Glen Alden stopped this pumping on June 20, 1961. Further, the testimony clearly demonstrates the impact of flushing, squeezes, and caves, on the cost and practicability of mining Law tract coal through the Woodward Colliery. Furthermore, as to a suggestion by plaintiffs' counsel that this coal could be mined through a shaft sunk directly to this tract, the testimony leaves no doubt that this would be economically impossible, and dangerous because of the "buried valley" and "wash" conditions. This finding is supported by the evidence, and there is no merit to plaintiffs' exception to it.

Plaintiffs have excepted to finding of fact no. 45, which is:

"45. The abandonment of the three collieries by Glen Alden left Glen Alden with no operating facilities through which the remaining coal in the leased tract could be mined".

Plaintiffs refer to this exception indirectly in their argument brief, as follows:

"It should be further pointed out that the Law tract coal was not rendered inaccessible, as the record clearly reveals that the defendant corporations could have, if they desired, purchased additional land as another means of access to the Law tract (447)".

On page 447-48 of the record, the following is the only testimony germane to the mining of the Law tract:

"Q. Now directing your attention to the Law tract specifically within the South Wilkes-Barre Colliery, could the Law tract in that colliery from a practical and economic standpoint have been mined alone without the mining of any other tract?

"A. No, sir.

"Q. Would it have been costly to attempt to mine only from the Law tract?

"A. It would . . .

"Q. Would it have cost more to mine solely from the Law tract?

"A. It would be economically impossible . . .

"Q. When you say 'economically impossible' you relate to what year?

"A. 1956—or any year".

The testimony hardly can be categorized as clearly supporting plaintiffs' exceptions. As noted above, under plaintiffs' exception to finding of fact no. 44, the "wash" and "buried valley" conditions involving the Law tract made it economically impossible and dangerous for defendants to attempt to reach the coal through the surface above it. Furthermore, defendant Lehigh & Wilkes-Barre was denied the use of this surface for this purpose by the terms of the lease, supra, finding of fact no. 28. Finally, there were three collieries through which access to the Law tract was had: Woodward, South Wilkes-Barre, and Lance. Findings of fact nos. 42, 43 and 44 detail the closing of these collieries. When these were closed, defendants had no collieries remaining through which the Law coal could be mined and removed, as these were the only three collieries through which Law tract coal had been mined. There is no merit to this exception.

In their respective exceptions no. 2 to the court's finding of fact no. 46, each defendant has excepted to the italicized part of this finding of fact:

"46. Defendant Glen Alden Corporation is a Pennsylvania corporation; defendant The Lehigh & Wilkes-Barre Coal Company is a Pennsylvania corporation *and since 1933 has been a wholly owned subsidiary of Glen Alden Corporation.* Each defendant's principal Offices are in the Borough of Ashley, Luzerne County, Pennsylvania". (Italics supplied.)

The court's finding of fact is in error as to the date

only. Plaintiffs' amended complaints, in paragraph 5, averred:

"5. The defendant, The Lehigh & Wilkes-Barre Coal Company, is a wholly owned subsidiary of the Glen Alden Corporation".

Defendants' respective answers admitted this averment and these admissions were read into the trial record. The facts of the sale of the physical assets of Lehigh & Wilkes-Barre, with the exception of the Law lease tract and the tracts held by Lehigh & Wilkes-Barre, by virtue of other unassigned leases, are not disputed. In 1929, Glen Alden paid for these assets by the transfer of 676,700 shares of Glen Alden stock, valued at $100 per share, to Lehigh & Wilkes-Barre, which, in turn, by 1933, had distributed these shares to its stockholders in exchange for the outstanding shares of Lehigh & Wilkes-Barre stock on the basis of two shares of Glen Alden stock for each share of Lehigh & Wilkes-Barre stock. Only 78 shares of Lehigh & Wilkes-Barre stock remained outstanding, held by the directors of this company. In 1942, Glen Alden acquired these 78 shares, and from that year Lehigh & Wilkes-Barre became a wholly-owned subsidiary of Glen Alden. To the extent that the date 1933 was incorrect, this exception will be sustained and finding of fact no. 46 will be revised and confirmed as follows:

"46. Defendant Glen Alden Corporation is a Pennsylvania corporation; defendant The Lehigh & Wilkes-Barre Coal Company is a Pennsylvania corporation and since 1942 has been a wholly owned subsidiary of Glen Alden Corporation. Each defendant's principal offices are in the Borough of Ashley, Luzerne County, Pennsylvania".

Plaintiffs have excepted to finding of fact no. 49, and defendants have excepted, no. 3, to the italicized portion of this finding:

"49. Subsequent to 1961, and the closing of the Woodward Colliery, the coal remaining in the Law tract was unmerchantable, *but prior to the abandonment of this Colliery Glen Alden could have mined and sold at a profit the coal from the Law tract with coal from other mines through Woodward Colliery, and thus until the closing of the Woodward Colliery in 1961 the Law Lease coal was merchantable*". (Italics supplied.)

Plaintiffs maintain that all of the coal in this tract was and is merchantable on the basis of the quality definition of "merchantability". If this definition were adopted by this court, we would be compelled to approve plaintiffs' position. However, as noted in this opinion, supra, under the preliminary discussion of finding of fact no. 49 and conclusion of law no. 5, this court has adopted and applied the definition of "merchantability" set forth in the Genelow Mining Co., Rinehimer and Commercial Coal Mining Co. cases, supra, and thus applies the use and profitable mining tests as well as that of quality to the coal in this tract.

Thus, the inquiry is whether before the closing of the Woodward Colliery in 1961 the recoverable coal in the Law tract was "merchantable" and thereafter was not. Plaintiffs maintain that this coal was merchantable both prior to that event and thereafter. Defendants maintain that this coal was not merchantable prior to that event, and cite the operating losses of Woodward Colliery in support of their position. The opposed positions fail to take into consideration several salient facts, namely: (1) While no Law tract coal was mined through the Woodward Colliery after 1957 (finding of fact no. 44), it could have been through "64 Tunnel", and Glen Alden, through Lehigh & Wilkes-Barre, continued to pay the minimum royalties on the Law lease coal after 1957 until April 1960,

including the period that Woodward Colliery was shut down; (2) after the closing of Woodward in 1957, Glen Alden reopened this colliery in 1959 and operated it until the Department of Mines order closed it on May 19, 1961; (3) until the final closing of Woodward in 1961, 2,221,700 tons of recoverable coal were available to Glen Alden through this colliery; (4) whatever the motives of Glen Alden may have been in reopening Woodward Colliery, and we do not believe these included the deliberate and informed attempt to mine and sell coal at a loss, particularly as the vice president and general manager of Glen Alden testified that Woodward was reopened in 1960 because the company officials "thought that it could be opened and probably could make a decent cost", this Law tract coal was available to it during this period, until the final closing and abandonment of this colliery, and, as Law tract coal was commingled with other coal at the breaker, it was at least a reserve of recoverable coal, to be considered as part of the coal available to Glen Alden in this operation; (5) it was not until the final closing and abandonment of the three collieries that Glen Alden, or its alter ego, Lehigh & Wilkes-Barre, was not in position to mine and remove, let alone sell, the Law lease coal. While we do not subscribe to plaintiff's position that the final closing of Woodward was due to the action of Glen Alden in permitting the water level in the Kingston pool to rise, we find, as did the trial judge, that thereafter the Law lease coal could not be mined by Glen Alden, or by Lehigh & Wilkes-Barre, as it no longer had any existence independent of Glen Alden, and that, therefore, it could not be mined profitably by either company. As noted by the trial judge:

" . . . If coal cannot be mined, it certainly cannot be sold at a profit". (Decision, p. 14.)

There is no merit to the exceptions of plaintiffs and defendants to this finding of fact, and it will be affirmed.

In an omnibus exception, plaintiffs except to finding of fact no. 53:

"53. All requests for Findings of Fact inconsistent with these Findings of Fact are hereby denied".

This exception is referred to in plaintiffs' brief, and it was argued before the court en banc as to the trial judge's refusal to accept requests nos. 33, 34(a), 40, 41, 42, 43, 44, 49, 55, 82, 84, 85, 88, 89, 91, 94, 95, 102 and 103. Plaintiffs filed requests for 156 specific findings of fact. Of these, 27 were concerned with the fractional interests of the several plaintiffs and the two defendants in the Law lease, and no exceptions were filed by any of plaintiffs or defendants to findings of facts nos. 1 - 27, inclusive, setting forth these fractional interests. The court's findings of fact and decision accepted the following requests of plaintiffs numbered 29, 31 - 33, 35 - 39, 41, 43, 45, 48 - 51, 53, 55 (until 1961), 56 - 81, 83, 84, 86, 88 - 116, 121 (until 1961), 125, 127 - 137, 139 - 156. The following requests of plaintiffs were considered by the trial judge to be either evidentiary or argumentative, and not proper subjects for findings of fact: Nos. 30, 42, 46, 47, 52, 117, 118, 119, 120, 121, 122, 124, 126, 138: First National Bank of Plymouth v. Jones' Estate, 334 Pa. 577, 581.

The following requests are inconsistent with the court's findings of fact, and were denied: (1) those predicated upon a definition of merchantability relating to quality alone, and therefore inconsistent with the definition adopted by the trial judge: 34, 40, 42, 44 (as to merchantability subsequent to 1961), 54, 55 (subsequent to 1961), 82, 123 (as to claimed royalties after 1961); (2) no. 85, as the evidence clearly indicates that Glen Alden was unable to maintain this

water, at a safe level (see discussion of exception to finding of fact no. 44, supra) ; (3) no. 87, apparently a stenographic error (N. T. pp. 420, 421, 424, 457).

For the reasons set forth above, plaintiffs' exception to finding of fact no. 53 is overruled, and this finding of fact will be affirmed.

Plaintiffs excepted to the discussion in the decision (page 11 et seq.), relative to the court's adoption of the definition of "merchantable coal", for the following reasons:

"(a) The cases cited as authority are readily distinguishable from the instant case.

"(b) The recoverable tonnage in the Law tract is 'merchantable' coal.

"(c) The fact that access to the Law tract became inaccessible was due to the deliberate acts of the Glen Alden, to wit: failure to pump water from the mines. The defendant should not be allowed to profit by its own wrongs".

Plaintiffs appear to reason that the term "merchantable" is related only to quality, and that any deviation from this narrow concept must be treated as an exception to this norm. The weight of authority is to the contrary: 58 C.J.S. Mines and Minerals, §2. See: Genelow Mining Co. v. Panzitta Mining Co., 51 Luz. 255; Rinehimer v. Lehigh & Wilkes-Barre Coal Company, 416 Pa. 216; Commercial Coal Mining Co. v. Big Bend Coal Mining Co., 293 Pa. 39, 43; Garman v. Potts, 135 Pa. 506, 521; Windber Construction Company, Inc. v. Coleman, 185 Pa. Superior Ct. 649, 653. Furthermore, finding of fact no. 44 clearly establishes that the primary cause of the rise in the water level is not assignable to Glen Alden, but to the "Knox Disaster", and that Glen Alden employed all available means to alleviate this condition, and did not close the pumping operations in the abandoned

Kingston mines until one month after the Department of Mines' order stopping all mining operations in the Woodward Colliery (see discussion of plaintiffs' exception to finding of fact no. 44). It is clear that there is no merit to plaintiffs' exceptions to the discussion of the court and for this reason this exception will be overruled.

EXCEPTIONS TO CONCLUSIONS OF LAW

Conclusion of law no. 1 was excepted to by defendants. Conclusion of law no. 3 was excepted to by plaintiffs and defendant Lehigh & Wilkes-Barre. Conclusion of law no. 4 was excepted to by plaintiffs and both defendants. Conclusion of law no. 5 was excepted to by plaintiffs and defendant Lehigh & Wilkes-Barre. Conclusion of law no. 6, denying plaintiffs' requests for conclusions of law nos. 33, 34, 42, 43, 44 and 64, was excepted to by plaintiffs. These exceptions will be considered seriatim:

"1. The Lehigh & Wilkes-Barre Coal Company, during the period 1930 to 1961 inclusive, has been operated by Glen Alden Corporation and its predecessor, Glen Alden Coal Co., as a department or instrumentality of Glen Alden Corporation and therefore Glen Alden Corporation is legally responsible for the obligations of The Lehigh & Wilkes-Barre Coal Company to plaintiffs herein".

The reasoning of the trial judge, and the facts on the basis of which the court concluded that Lehigh & Wilkes-Barre was operated by Glen Alden as a department or instrumentality of Glen Alden, from 1930 to 1961, inclusive, are set forth in detail in the decision under the exception to finding of fact no. 40 supra. In their argument brief, defendants deny the applicability of the Rumig and McCarthy cases, supra, cited by the trial judge as authority for his position in finding Glen Alden responsible for the royalty payments found to be owed plaintiffs by Lehigh & Wilkes-

Barre until the end of 1961. It is clear that Lehigh & Wilkes-Barre, as lessee of the Law lease, in 1929 had access to the Law coal, the right to remove and sell it, and the obligation to pay the royalties thereon, subject to termination of the lease by forfeiture declared by the lessors or when all the merchantable coal was mined, removed, and paid for: finding of fact no. 28. It is also clear that Glen Alden, as a practical matter, succeeded to both the right and obligations of Lehigh & Wilkes-Barre as to this coal, first through the "mining agreement" of 1929 (finding of fact no. 15), and then by a complete domination of the operation of mining, removing, selling of the coal and paying the taxes and minimum royalties due under this lease (see discussion of the exceptions to finding of fact no. 40 supra). The only function performed by Lehigh & Wilkes-Barre, after 1930, was to serve as a conduit through which Glen Alden paid taxes and minimum royalties. The respective positions of the two corporations, on the one hand, and the lessors, on the other hand, during the thirty years from 1930 to 1961, likewise are clear. Glen Alden mined and sold 10,518,598 tons of Law lease coal during this period and changed the barrier pillar between Woodward and Lance Collieries: finding of fact no. 48. After 1942, Glen Alden was sole owner of Lehigh & Wilkes-Barre: finding of fact no. 46. If Glen Alden had not paid the taxes and the minimum royalties during this thirty-year period, it would have run the risk of having the lease forfeited, and would have had no access to the coal or right to remove and sell it. While the "mining agreement" of 1929 (finding of fact no. 15) established Glen Alden as a mining contractor, the actual relationship was determined in 1930 by abrogating the "mining agreement", to the extent that Glen Alden paid Lehigh & Wilkes-Barre the minimum royalty due the lessors, taxes and miscellaneous costs in lieu of

the cost-plus formula set forth in this "mining agreement". Glen Alden thus assumed the obligation of the lessee to pay royalties and taxes, and accepted the risk of incurring losses or making a profit in the mining and sale of the Law coal. As Glen Alden did not furnish monthly statements of its mining in the Law tract, and commingled the Law lease coal with coal mined from other Glen Alden properties, even though the "mining agreement" was renewed and extended without substantial change in 1934, 1939, 1944 and 1954, the operation of this leased area was not conducted in accordance with this agreement, but rather in accordance with the understandings reached in 1930. The 1954 renewal was signed by the same persons representing both corporations in the same executive positions: findings of fact nos. 37 - 40 inclusive.

In Botwinick v. Credit Exchange, Inc., 419 Pa. 65, at page 72, the Supreme Court of Pennsylvania stated:

"Neither the similarity of names between the parent and subsidiary corporation . . . nor the total ownership of the stock of the subsidiary by the parent . . . nor the fact that a single individual is the active chief executive of both corporations . . . *will per se justify a court in piercing the corporate veil if each corporation maintains a bona fide separate and distinct corporate existence*". (Italics supplied.)

Glen Alden purchased the coal properties of Lehigh & Wilkes-Barre in 1929, and paid 676,700 shares of Glen Alden stock to Lehigh & Wilkes-Barre for these assets; and Lehigh & Wilkes-Barre distributed these shares to its stockholders, in exchange for their Lehigh & Wilkes-Barre shares, in 1933: findings of fact nos. 35 and 47. Included in the purchase price so paid, calculated at $67,670,000, was the full amount of the credit for prepaid royalties paid to 1930 by Lehigh & Wilkes-Barre to the lessors from 1875 to 1930, in the amount of $1,575,094.27: findings of fact nos. 34, 35,

36. Having thus paid Lehigh & Wilkes-Barre for these prepaid royalties and the coal remaining in place at a fixed depletable rate of 4¢ per ton, Glen Alden secured the right to mine the coal on a cost-plus basis by virtue of the mining agreement. The plan contemplated by this agreement never attained fruition, as noted above. Having been unable to obtain approval of any assignment of the Law lease to Glen Alden by Lehigh & Wilkes-Barre from the lessors, the subsequent modification was made by the executive officers of the two corporations, and Glen Alden thus obtained the right not only to mine the coal but also to sell it, thus utilizing the royalty prepayments it had purchased. There can be no other conclusion than that this procedure was adopted to enable Glen Alden to do what it was unable to accomplish through assignment of the lease by Lehigh & Wilkes-Barre. Furthermore, Lehigh & Wilkes-Barre after 1933 when it distributed its major asset, the Glen Alden stock, to its shareholders, no longer had any "bona fide separate and distinct existence" or any existence whatsoever other than a conduit for the royalty and tax payments. We thus conclude that the facts of this case, as noted in this discussion, and that applicable to finding of fact no. 40, concerning the relationship between the two defendant corporations, justify piercing the corporate veil, and finding as a conclusion of law that Glen Alden operated Lehigh & Wilkes-Barre as its department or instrumentality, and thus is legally responsible to plaintiffs herein for the obligation of Lehigh & Wilkes-Barre to pay the minimum royalty through the year 1961. Defendants' exceptions to this conclusion of law will be overruled.

Conclusion of law no. 3, excepted to by plaintiffs in its entirety, and defendant Lehigh & Wilkes-Barre as to the italicized portion, is as follows:

"3. *The obligation of The Lehigh & Wilkes-Barre Coal Company to pay the annual mine rent or royalty extended through the year 1961* and terminated thereafter".

Plaintiffs maintain that the Law lease coal remaining in the ground is merchantable, and that the obligation to pay the minimum annual royalty therefor did not terminate at the end of 1961. Defendant Lehigh & Wilkes-Barre maintains that this coal was not merchantable in 1960 and 1961, and, therefore, there was no obligation upon it to continue to pay the minimum royalty during those years, and, in the alternative, if the unmined coal were determined to be merchantable, it has been paid for. The court has held that the coal remaining in the Law tract lost its merchantable character on May 19, 1961, when Woodward Colliery finally was permanently shut down (see discussion of finding of fact no. 49, supra). The lease, plaintiffs' exhibit #1 (see: finding of fact no. 28) clearly imposed on the lessee the obligation to pay the minimum annual royalty so long as merchantable coal remained unmined. The right to remove this coal was the feature of the lease which was kept alive by the annual royalty payment. On May 19, 1961, for the purposes of this lease, all the merchantable coal had been mined, removed and paid for, and therefore by the plain and unequivocal terms of the lease, Lehigh & Wilkes-Barre had no further obligation to pay the annual royalty or mine-rent after that year. The lease is also clear that this annual royalty was to be paid without reference to any prepaid royalty credit and continued until the exhaustion of the merchantable coal. Thus, the fact that on that date Lehigh & Wilkes-Barre had established a prepaid royalty credit of $586,897.56 (finding of fact no. 50) does not affect the current minimum royalty payments for the years

1960 and 1961, as it could only be applied as payment for coal mined in excess of the annual minimum. During the thirty years of Glen Alden participation in the mining and sale of this Law lease coal, and during which it advanced the annual minimum royalties to Lehigh & Wilkes-Barre for payment to the lessors, the net prepaid royalty credit decreased from $1,575,094.-27 to $586,897.56 (findings of fact nos. 36 and 50), as Glen Alden mined and removed 10,518,598 tons of Law lease coal, and charged the excess over the annual minimum against the prepaid royalty credit: finding of fact no. 48. During the period 1930-1960, there was no departure from this method of payment as set forth in the original lease, until Glen Alden stopped advancing the annual minimum royalty monies to Lehigh & Wilkes-Barre in 1960. Furthermore, no exceptions were filed by any of the parties to conclusion of law no. 2, holding that Lehigh & Wilkes-Barre was obligated to pay the annual minimum royalty, until all the merchantable coal in the Law Tract was exhausted. For these reasons, there is no merit to the exceptions filed to this conclusion of law and it will be affirmed.

Conclusion of law no. 4, to which exceptions have been filed by all parties to this action (defendants excepting to the italicized portion thereof, plaintiffs to the entire Conclusion) is as follows:

"4. Glen Alden Corporation having been held responsible *for the obligation of The Lehigh & Wilkes-Barre Coal Company to pay the semi-annual mine rent or royalty accruing October 1, 1960, and the two semi-annual payments accruing for the year 1961*, is indebted to plaintiffs in the sum of $33,892.35 plus interest, each plaintiff being entitled to receive the proportionate share of this sum determined by his respective ownership interest in the 'Law Lease' ".

As the court has determined that no merchantable coal remained in the Law tract after May 22, 1961,

and that the obligation of Lehigh & Wilkes-Barre to pay the minimum annual royalty continued through 1961, and terminated thereafter (see discussion under exceptions to conclusion of law no. 3, supra), and as no exceptions were filed to findings of fact nos. 1 to 27 inclusive, as to the interests of the several plaintiffs and defendants in the Law lease, the exceptions to this conclusion of law have been discussed, and determined to be without merit. This conclusion of law will be sustained.

Plaintiffs and defendant Lehigh & Wilkes-Barre Coal Company have excepted to conclusion of law no. 5, which is as follows:

"5. From and after May 19, 1961, the merchantable coal in the Law Tract then having been mined and removed and paid for, the 'Law Lease' obligation of The Lehigh & Wilkes-Barre Coal Company to pay any coal royalties terminated at the end of 1961".

This conclusion followed the clear language of the original lease (plaintiffs' exhibit #1; finding of fact no. 28). The annual minimum royalty of $35,000 was payable in two installments, on April 1 and October 1, until all the merchantable coal would have been exhausted. The court has determined the date of the exhaustion of the merchantable coal to have been May 19, 1961, the date on which the Department of Mines ordered Woodward Colliery closed. This order was received by defendants on May 22, 1961, and on that date Woodward was closed. There is no provision in the lease for pro-rating the annual minimum mine rent or royalty, and thus the court concluded that this payment was due for the entire year 1961. There is no merit to the exceptions to conclusion of law no. 5 and it will be affirmed.

By conclusion of law no. 6 the trial judge ruled:

"6. All other requested Conclusions of Law inconsistent herewith are denied".

Plaintiffs excepted to this conclusion of law, but limited their specific objections under this exception to the trial judge's failure to arrive at six of their requested conclusions of law, namely, nos. 33, 34, 42, 43, 44 and 64. These will be considered seriatim:

"33. A lease of coal in place 'until such time as all the available merchantable coal shall have been mined and removed' constitutes a sale of an estate in fee simple; and the remaining interest of the lessor in the royalties to be paid under the lease is personalty".

This request was embodied in the discussion by the trial judge, on page 13 of his opinion. There is no question that it correctly states the law of Pennsylvania, and it was not disputed in this action as a principle of law: Essex Coal Company Appeal, 411 Pa. 618, 622; Smith v. Glen Alden Coal Company, 347 Pa. 290, 298, 302. Finding of fact no. 31, to which no exceptions were filed, followed this principle and applied it to this lease, thus concurring with plaintiffs' requested finding of fact no. 33, which is a verbatim restatement of their requested conclusion of law no. 33. There having been no dispute as to this principle or its application to this action, it was unnecessary for the trial judge to make a specific conclusion of law applicable to it. There is no merit to this exception.

Plaintiffs' requested conclusions of law nos. 34, 42, 44 and 64 are as follows:

"34. 'Merchantable coal' as used in the Law Lease means: Fit for market; such as is usually sold in market. Suitable for market".

"42. The testimony of John C. MacCartney, a recognized expert in mining, is undisputed, and he stated that the agreed recoverable tonnage underlying the said Law Tract constitutes merchantable coal (244)".

"44. The Law Tract coal: (a) was merchantable in 1875; (b) was merchantable from 1875 to 1900; (c) was merchantable in 1900; (d) was merchantable

from 1900 to 1960; (e) was merchantable in 1961, 1962 and 1963; (f) is presently merchantable; (g) will be merchantable in the future; (h) is now and will be merchantable until it has been mined to exhaustion".

"64. John MacCartney's testimony as a recognized authority and expert on anthracite is accepted by the Court when he stated that the coal remaining in the Law Tract is 'merchantable' ".

The core of each of these requested conclusions is plaintiffs' assumption that they are correct in their proposed definition of "merchantable", as applied to coal. The trial judge did not concur with plaintiffs, and followed the definition adopted by this court in the Genelow Mining Co. Case, supra, the Supreme Court of Pennsylvania in the Rinehimer case, supra, and set forth in Corpus Juris Secundum, supra: see discussions of plaintiffs' exceptions to finding of fact no. 49 and conclusion of law no. 5, supra. In fact, the trial judge concurred with that portion of plaintiffs' requested conclusion no. 44 set forth in subdivisions (a), (b), (c), (d) and (e), as to the year 1961. While Mr. MacCartney testified as set forth in requested conclusions nos. 42 and 64, he was not applying the definition of merchantability adopted by the trial judge pursuant to the cited authorities. As noted in the trial judge's opinion, at page 12:

"An inherent difficulty with this definition is that the application of it at various points of time may result in different computations as to the total amounts of 'merchantable coal' mined or remaining in the ground depending upon industrial and economic factors as well as upon the quality of the coal".

Thus, whether this remaining coal will at some time in the future again become "merchantable" cannot be known at this time. For the purposes of this action, the court has concluded that it lost this charac-

teristic in May, 1961, when the Department of Mines issued the stop order, and the Woodward Colliery was closed: see the discussion of finding of fact no. 49, supra. There is no merit to plaintiffs' exceptions to the trial judge's failure to make these requested conclusions.

Plaintiffs have excepted to the trial judge's failure to concur with their requested conclusion of law no. 43, which is as follows:

"43. Glen Alden does not know nor can it compute the actual cost of a ton of coal extracted from the Law Tract (178)".

This requested conclusion is identical with plaintiffs' requested finding of fact no. 43. Under the terms of plaintiffs' exhibit #15, the "mining agreement" of 1930, Glen Alden would have been obligated to determine the costs of mining the Law lease coal. This mining agreement was revised shortly after its adoption (findings of fact nos. 37 and 40), and Glen Alden made no attempt to determine the costs of mining Law lease coal as such but commingled this coal with coal mined from other tracts in the collieries operated by it. This requested conclusion is a valid statement of the operation by Glen Alden of the Law tract and has been incorporated by the trial judge in his conclusion that Glen Alden operated Lehigh & Wilkes-Barre as a department or instrumentality of Glen Alden, and to that extent it has been accepted by the court as a fact. However, it is not a conclusion of law and is evidentiary. For this reason the trial judge was warranted in not making a separate conclusion of law as to this statement. There is no merit to this exception.

Each defendant filed exceptions to the order of the court dated April 21, 1965, and filed with the trial judge's findings of fact, conclusions of law and decision of that date. This order has been set forth ver-

batim at p. 668, supra. The liability of Lehigh & Wilkes-Barre for royalty payments through 1961, Glen Alden's responsibility for this obligation, the amount of the royalties due, and the respective interests of the several plaintiffs in these royalties having been determined, and the findings of fact and conclusions of law on which these were based having been determined to be in accordance with the evidence and the law applicable thereto, this court further finds that this omnibus exception by defendants is without merit and the order of the trial judge will be affirmed.

ORDER

Defendants' exception to finding of fact no. 46 having been sustained by this court as to the date 1933 set forth therein, and this finding of fact having been modified by the insertion therein of the date 1942 in lieu of the date 1933, this court affirms finding of fact no. 46 as revised, and overrules the exceptions filed by plaintiffs and defendants to the trial judge's findings of fact, conclusions of law and order, affirms the trial judge's findings of fact, conclusions of law and order, and hereby directs the prothonotary to enter judgment thereon for plaintiffs in accordance with their respective interests against defendants in the amount of $33,892.35 plus interest.